T. C. V'SOSKE, S. T. V'Soske, K. A. V'Soske, George A. Spater and V'Soske Shops, Inc., Appellants,

v.

E. T. BARWICK and E. T. Barwick Mills, Inc., Appellees.

Nos. 92/6, Dockets 32484/8.

United States Court of Appeals Second Circuit.

Argued Oct. 3, 1968.

Decided Nov. 8, 1968.

Rehearing Denied Dec. 30, 1968 In Banc.

Certiorari Denied March 24, 1969.

See 89 S.Ct. 1197.

Lumbard, Chief Judge, dissented.

Carl S. Rowe, New York City (Harold L. Warner, Jr., Edward P. Smith, New York City, on the brief, Chadbourne, Parke, Whiteside & Wolff, New York City), for appellants.

Patrick H. Sullivan, New York City (Forbes D. Shaw, T. David Mullen, New York City, on the brief, Whitman, Ransom & Coulson, New York City), for appellees.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The question for our determination is whether the parties by their correspondence made a binding offer and acceptance to buy and sell a business, so that even in the absence of a formal contract they created a legally enforceable agreement.

Appellants, V'Soske Shops, Inc., and its individual stockholders T. C. V'Soske, S. T. V'Soske, K. A. V'Soske, and George Spater, on June 22, 1964, brought this action against E. T. Barwick Mills, Inc., and its president and majority stockholder E. T. Barwick in the New York State Supreme Court for New York County seeking damages for breach by Barwick of an alleged contract in which he had agreed to purchase the assets and good will of V'Soske Shops, Inc., for a sum equal to its audited net worth plus $700,000.[1] Upon petition of the appellees, the action was removed to the United States District Court for the Southern District of New York because of diversity of citizenship.[2] A trial before Judge MacMahon without a jury resulted in the judgment dismissing the action on the merits which is the subject of this appeal.

I.

V'Soske Shops is a small Puerto Rican corporation engaged in the manufacture of high quality custom-made rugs. Thad V'Soske manages the business, and his brother S. T. V'Soske is its principal designer. Barwick Mills, a Georgia corporation, is a large manufacturer of tufted carpets; prior to 1964 it did not manufacture custom-made rugs.

In the spring of 1963, Mr. E. T. Barwick [hereafter referred to as Barwick] became interested in entering the custom-made rug market by acquiring the business of V'Soske Shops. Preliminary negotiations were conducted at an initial meeting between Barwick and the V'Soskes in June of 1963 in Puerto Rico, where Barwick inspected their plant, and in New York the following August, where Barwick met with Spater, a V'Soske

1. Appellants also sought damages on behalf of the corporation for the alleged violation by Barwick of an agreement to keep the existence of the alleged contract confidential and for an injunction restraining Barwick from using alleged trade secrets. However, the District Court granted appellees' motion to dismiss these claims, and appellants have not appealed that ruling.

2. V'Soske Shops, Inc. is a Puerto Rican corporation, and all the individual appellants are residents of Puerto Rico, with the exception of George A. Spater, who is a resident of New York; E. T. Barwick Mills, Inc. is incorporated in Georgia and has its principal place of business there, and E. T. Barwick is a resident of Georgia.

stockholder and attorney. At a second meeting in Puerto Rico in early September, discussions turned to the subject of price: the V'Soskes stated that they wanted $4,000,000 for their business, and Barwick responded with a suggestion of $1,500,000. The meeting concluded with Thad V'Soske's statement that they were open to further negotiation, and Barwick's answer that he would think it over.

After Barwick's return, a series of letters were exchanged which appellants claim gave rise to a binding contract for the sale of the V'Soske business. On September 9, 1963, Barwick wrote Thad V'Soske, saying:

"* * * I am prepared to offer you $1,600,000 for the V'Soske Shops, Inc., subject of course to independent audits concerning the $1,000,000 net worth of the manufacturing entity.

"I should like to suggest that if the transaction is acceptable to you, the initial payment of $1,000,000 for the company and the remaining $600,000 over the next four years in equal payments.

"All phases of operations and management would be along the lines of our conversation.

"After you have had time to consider this proposal, I shall be very glad to hear from you."

After receiving V'Soske's return letter, in which he sought to explain why the past profit of V'Soske Shops had been low, and why higher profits were to be expected in the future, Barwick responded with a letter, dated October 10, setting forth at great length the reasons which he believed justified his last offer, and concluding:

"I am willing, at this time, to increase my offer for a cash settlement for the audited book value of your company plus $700,000 to be paid in five equal annual installments of $140,000 each, with management contracts or arrangements as we discussed on our two visits.

"I think this is as far as I am willing to go, and I should like to know within thirty days whether or not this offer will be accepted because I do not feel I can wait much longer before entering into this type of manufacture, perhaps in closer proximity to my plants in North Georgia."

On October 28, V'Soske wrote Barwick asking that he extend his offer for another thirty days, to which Barwick acceded, stating: "Please let me know as soon as possible your decision." Then on November 29, V'Soske responded:

"We have reviewed your offer carefully and have come to the conclusion that we are willing to sell our business at the price you propose—its audited net worth plus $700,000—on the following terms:

1. $1,200,000 down, payable within 30 days after an agreement is reached; the balance to be paid in equal monthly installments over a period of four years.

2. Employment contracts will be signed with our five top management people for five years at present rates of compensation (aggregating $74,500.00 annually) for jobs having responsibility equal to their present jobs and at their present location in Puerto Rico, as per verbal agreement.

3. Any brokerage or finder's fees, * * * to be paid by you.

4. The scope of the audit to be as outlined below."

There followed a lengthy discussion of the proposed audit, specifying, *inter alia,* that inventories and fixed assets would be valued at cost, that the rates of depreciation on fixed assets would be as therein specified, that a $93,000 advance made by V'Soske to its Irish affiliate would be valued at face amount, and that the audit would be made by "a nationally recognized firm of certified public accountants comparable to Haskins & Sells [the firm which regularly audited the V'Soske books]." Throughout this letter, V'Soske emphasized that he wished these

methods of valuation to be clearly understood at the outset in order that later disputes be avoided. Then on December 2, Barwick wrote back saying:

"I agree in principle with your outline of evaluation and I see no obstacle in our agreeing inasmuch as I have a high regard for Haskins & Sells * * *. Our overall public accountant is Arthur Anderson whom I am sure you have respect for also and I am sure Arthur Anderson and Haskins & Sells will have no difficulty in reconciling the account."

The letter went on to ask that V'Soske clarify certain points discussed in his last letter. After receiving the requested information, Barwick wrote on December 6:

"As stated in my recent letter I am in accord with your outline for purchase.

"I should like, if it is convenient for you, to visit you on the 19th and 20th of December with Mr. Mel E. Kellar, our Vice President and Treasurer to begin procedures for consummating the purchase."

The parties then began "procedures for consummating the purchase." On December 19 and 20, Barwick accompanied by three of his staff, again visited the V'Soskes in Puerto Rico. During this visit the Barwick group discussed with the partner in charge of the Haskins & Sells office in Puerto Rico the procedure for the 1963 audit, toured the V'Soske plant again, and agreed that the independent audit to determine audited net worth would commence immediately after the end of the year. The audit was begun on January 7, 1964, when Haskins & Sells, together with Arthur Anderson and Barwick's own experts, started the physical inventory of V'Soske Shops; that phase of the audit was subsequently completed to the satisfaction of all the parties.

On January 18, another series of meetings was held between the parties and their representatives in Puerto Rico. During these meetings, a number of points were raised, some of which were resolved without difficulty. Several illustrations of these items follow. Barwick advised V'Soske that for tax and other reasons he wished to effect the acquisition by a purchase of assets rather than stock. After some deliberation, V'Soske agreed, and it was mutually decided the V'Soskes would run their business for Barwick's account as of January 1, 1964, and that all transactions not in the ordinary course of business would thereafter be cleared with Barwick. Also, matters including warranties and security on the deferred purchase price were discussed and apparently settled. Other questions raised at this time, however, became the subject of protracted controversy. Barwick suggested that the contemplated employment contracts should contain a cancellation clause entitling him to cancel these agreements at any time upon the payment of one-half the balance due for the five-year term; and on his side, V'Soske proposed that he be given a $30,000 per year expense account similar to the one he had enjoyed in the past. After long negotiations, both of these terms were finally agreed upon several days before Barwick's repudiation in March. Another problem centered on Barwick's insistence that V'Soske Shops modify its exclusive sales contract with Lord & Adams so as to permit the sale of V'Soske products through Barwick's selling organizations. This matter, first raised at the January meetings, was never resolved. And further, Barwick's accountants raised certain objections to Haskins & Sells accounting procedures which also seem never to have been resolved.

Finally, during February, a draft of the formal written contract was circulated, and the parties met again in early March to discuss the remaining problems and to revise this draft. But upon his return from Puerto Rico, Barwick sent V'Soske a letter on March 9 stating:

" * * * I have reviewed the situation and have come to the conclusion that

we should terminate negotiations looking toward the purchase of your business."

## II.

The trial court found that the correspondence between the parties presented "almost a classic case of preliminary negotiations which never ripened into a contract," and accordingly awarded judgment to appellees. For the reasons below, we reverse.[3]

■ Looking first to the correspondence itself, we believe that Barwick's letter of October 10, 1963, was not merely an incident in "preliminary negotiations," but an actual offer for the purchase of V'Soske Shops. Not only did Barwick himself characterize it as an offer, but he specified the time limit within which it was to be operative, and later agreed to an extension in response to V'Soske's request. When viewed in light of the American Law Institute's Restatement definition of an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it," Restatement (Second) of Contracts § 24 (Tent. Draft No. 1, 1964), Barwick's letter can hardly be construed otherwise than as extending to V'Soske the power of acceptance. Regarded in this context, V'Soske's letter of November 29, since it made a substantial change in the terms of payment and added other significant terms, must be interpreted as a counter offer, which Barwick accepted by his letter of December 6 after receiving the clarifications he had requested.

■ Appellees argue that even if the language of the correspondence may be so interpreted, there was no intent to be bound until the signing of a formal document, and hence no obligations were fixed. Two rules on this subject are well established: first, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event. Smith v. Onyx Oil and Chemical Co., 218 F.2d 104, 50 A.L.R.2d 216 (3d Cir. 1955); Zirman v. Beck, 34 Misc.2d 597, 225 N.Y.S.2d 330 (1962); Karson v. Arnow, 32 Misc.2d 499, 224 N.Y.S.2d 891 (1962); Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431 (1894); Restatement (Second) of Contracts § 26 (Tent. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957). Contract law has progressed and evolved sounder principles since the days of ritualistic and formalistic sealed instrument requirements. Thus, these rules, placing the emphasis on intention rather than form, are sensible and reasonable.

■ To overcome the reasonable inference we draw from the language of the correspondence that the parties did indeed intend thereby to create a binding contract, appellees must do more than merely point to the circumstance that a formal document was contemplated: they must show either that both parties understood that their correspondence was to be of no legal effect or that V'Soske had reason to know that Barwick contemplated that no obligations should arise until a formal contract was executed. But appellees have referred to no evidence substantiating either of these possibilities, and we do not find them supported by our independent review of the evidence. Moreover, the subsequent agreement of the parties that the V'Soske business would be run for the Barwick company's account starting January 1, 1964, and that all transactions after that date not occurring in the ordinary course of business would be subject to Barwick's approval strongly indicates that the parties

---

3. Since the parties stipulated below that New York law should govern, we shall consider New York as the source of the applicable law.

thought they had a binding agreement at that time. Accordingly, we find that by their correspondence the parties did intend to create a contract for the sale of V'Soske Shops.

 Appellees strongly urge that even if we find contractual intent, nevertheless a binding contract never came into being because too many important terms were left unsettled by the exchange of letters. In support of this contention they point to the subsequent difficulties the parties encountered in reaching agreement on certain terms. The law is clear that although the parties may intend to enter into a contract, if essential terms are omitted from their agreement, or if some of the terms included are too indefinite, no legally enforceable contract will result. Kusky v. Berger, 33 Misc.2d 564, 225 N.Y.S.2d 797 (1962), aff'd, 20 A.D.2d 851, 249 N.Y.S.2d 858 (1964); Willmott v. Giarraputo, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959); Warrin v. Charm Fashions, Inc., 193 Misc. 229, 82 N.Y.S.2d 476 (1948), aff'd 275 App.Div. 815, 89 N.Y.S.2d 704 (1949). But it is also plain that all the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy. Park Inn Hotel Inc. v. Messing, 31 Misc.2d 961, 224 N.Y.S.2d 179 (1962); Biothermal Process Corp. v. Cohu & Co., Sup., 119 N.Y.S.2d 158 (1953), aff'd 308 N.Y. 689, 124 N.E.2d 323 (1954); Castelli v. Tolibia, Sup., 83 N.Y.S.2d 554 (1948), aff'd 276 App.Div. 1066, 96 N.Y.S.2d 488 (1950); May Metropolitan Corp. v. May Oil Burner Corp., 290 N.Y. 260, 49 N.E.2d 13 (1943). In this case, almost all of the later points of contention, such as the provisions of the employment contract and the modification of the V'Soske agreement with Lord & Adams arose because the parties sought to amend their agreement to include new terms. Such negotiations on new provisions do not defeat the original agreement of the parties. See John W. Rouse Construction Corp. v. Albany Acoustical Corp., 9 A.D.2d 38, 189 N.Y.S.2d 532 (1959); Sanders v. Pottlitzer Bros. Fruit Co., supra. The only term in their original contract upon which the parties later faltered was "audited net worth." But that these parties failed to agree as to the valuation of audited net worth does not convince us that the term is intrinsically so difficult to ascertain as to defeat the contract. On the contrary, the term has a well defined meaning and provides a method of valuation by which the exact amount contemplated can be determined. Castelli v. Tolibia, supra. And indeed, courts have upheld contracts where essential terms were far less definite. See, e. g., Biothermal Process Corp. v. Cohu & Co., supra; May Metropolitan Corp. v. May Oil Burner Corp., supra. Moreover, all the other terms essential to the agreement were specified in V'Soske's counter offer of November 29. We therefore hold that by their correspondence, the parties entered into a valid contract, which Barwick breached by his letter of March 9, 1964.

Since the trial court has not had an opportunity to consider the issue of damages, we remand for that purpose.

Reversed and remanded.

LUMBARD, Chief Judge (dissenting):

I dissent. Judge MacMahon found that the parties here engaged in nothing more than preliminary negotiations and that they did not intend to be bound until a written agreement had been executed. I do not see how, on this record, we can say that these findings—which are surely as much fact as law—were clearly erroneous. Rule 52(a), Fed.R.Civ. Procedure. On the contrary, I feel that the record amply supports Judge MacMahon's findings and that the judgment should therefore be affirmed.

Subsequent to December 6, 1963, the date on which the majority say there was a binding agreement, two written con-

tracts were drafted and there were numerous meetings and discussions between the parties and their attorneys regarding the provisions of these contracts. The record shows that several matters of importance had not been resolved as of December 6, many of which were never in fact resolved. These include:

1. Accounting treatment and valuation of certain items in calculating audited net worth.

2. Various tax matters, such as whether the purchase should be a stock or asset acquisition.

3. Treatment of the Lord & Adams exclusive sales contract with V'Soske which involves about one-third of the United States market.

4. The terms of the employment contracts of the five principal executives, and particularly the $30,000 expense account of Thad V'Soske.

5. Whether a mortgage should be given on the V'Soske property to secure the deferred balance in the purchase price.

In my opinion these are precisely the kinds of matters which any prudent purchaser would wish to have resolved before finally committing himself to paying over $1,700,000 for a going business and incurring continuing obligations to the very persons who had sold the business and who were expected to continue in its management for as long as five years. In these circumstances it is only logical that the parties did not intend to be bound before the execution of a detailed formal contract, and that they would not, under New York law, be so bound. See Schwartz v. Greenberg, 304 N.Y. 250, 107 N.E.2d 65 (1952); Willmott v. Giarraputo, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959); Kusky v. Berger, 33 Misc.2d 564, 225 N.Y.S.2d 797 (1962), aff'd, 20 A.D.2d 851, 249 N.Y.S.2d 858 (1964).

I would affirm the judgment of the district court.