**INTERPACE CORPORATION,**
Plaintiff,

v.

**PENBROOK HAULING COMPANY, INC.,
and Daily Express, Inc.,
Defendants.**

Civ. A. No. 73–280.

United States District Court,
M. D. Pennsylvania.

Feb. 18, 1975.

Ronald M. Katzman, Goldberg, Evans & Katzman, Harrisburg, Pa., for plaintiff.

Clyde W. McIntyre, McNees, Wallace & Nurick, Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

HERMAN, District Judge.

This matter is before the court on defendants' motion for partial summary judgment. The motion was argued to the court on September 19, 1974.

Plaintiff, a manufacturer of reinforced concrete pipe, entered into an agreement with defendant Penbrook Hauling Company, Inc.[1] (hereinafter "Penbrook") on July 29, 1970. A copy of the agreement is attached as a supplement hereto. Plaintiff contends that on June 6, 1971 Penbrook breached the contract by refusing to transport plaintiff's product, in violation of the provision in paragraph 9 which requires written notice 60 days prior to terminating the contract. Plaintiff claims that substitute carriers during the period June 7, 1971 to July 27, 1971 charged $28,082.24 more than would have been due the defendants had they continued performance until July 27, 1971. Jurisdiction is alleged under 28 U.S.C.A. § 1332.

Penbrook seeks summary judgment on plaintiff's claim for breach of contract[2] and on its counterclaim for the sum of $20,300.00 for services rendered under the contract.

The court is mindful of the well-established principle that the moving party to a motion for summary

[1]. The complaint names as defendants Penbrook and Daily Express, Inc., alleging that the former is a wholly owned subsidiary of the latter. Plaintiff alleges that Penbrook entered into the July 29th agreement as a convenience and for the benefit of Daily Express, Inc. Both defendants are represented by one counsel and the motion for partial summary judgment is filed on behalf of both defendants. Since Penbrook is a party to the purported contract with plaintiff, this memorandum will refer to Penbrook rather than both defendants.

[2]. In addition to the claim for $28,082.24, plaintiff seeks damages for additional unloading charges ($12,342.17) and for materials damaged in transit while in the custody of defendants ($13,325.91). Penbrook's motion for summary judgment excludes the latter two claims.

judgment has the burden of showing the absence of a genuine issue as to any material fact and the matter properly before the court must be viewed in the light most favorable to the opposing party. Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Penbrook's position is that the written agreement fails as a contract because it lacks mutuality of obligation and is unenforceable due to indefiniteness. It argues that the writing should be construed as merely an arrangement as to terms which would apply to a contemplated series of future contracts.

Plaintiff resists summary judgment on the grounds that defendants have not demonstrated the absence of a genuine issue of material fact, and that, notwithstanding the parol evidence rule, certain unspecified evidence would be admissible to explain the intentions of the parties and the meaning of the written agreement.

■■ The first issue which requires the court's scrutiny is the applicability of the parol evidence rule. If Penbrook is right that based on New York law [3] the written agreement is unambiguous yet fatally deficient, and that parol evidence is inadmissible to remedy its deficiencies, then it is entitled to summary judgment. See, 6 Moore, Federal Practice ¶ 56.17[43]. On the other hand, if parol evidence is admissible as plaintiff contends, then summary judgment would be inappropriate since an issue of fact may arise therefrom. The same would be true if the court, as plaintiff advocates, interprets the writing so as to cure its alleged deficiencies.

■ A general statement of the parol evidence rule is that where parties have reduced their agreement to writing, the rule operates to exclude evidence of prior or contemporaneous agreements when offered to contradict, vary or subtract from the terms of the writing. Aratari v. Chrysler Corp., 35 App.Div.2d 1077, 316 N.Y.S.2d 680 (1970). Where there exists an ambiguity or the language of the instrument is doubtful, extrinsic parol evidence is admissible. Re Silberman's Will, 23 N.Y. 2d 98, 295 N.Y.S.2d 478, 242 N.E.2d 736 (1968). The parol evidence rule is essentially a rule of law which defines the limits of the contract to be construed by the court. Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646 (1923).

■ In resolving the various assertions made by the parties to the instant case, the court looks to the writing in its entirety. Of particular significance, however, is paragraph 2 of the contract which provides as follows:

> "Shipper shall tender to Carrier each year during the term of this Contract for transportation by motor vehicle between points set forth in Item 1 above, not less than 100 tons of products described in Item 1 of this Contract."

The above paragraph is the sole provision in the writing which contains a quantity term.

Plaintiff's position is that prior negotiations are admissible to show that the parties to the writing intended it to be an output contract whereby plaintiff was obligated to tender the entire output of its Greenport plant to Penbrook and that Penbrook promised to transport the entire output. Such a position presumes that the meaning of the only quantity term in the writing—"not less than 100

---

3. For conflict of laws purposes, the parol evidence rule is a matter of substantive law, not a rule of evidence. Crompton-Richmond Co., Inc.—Factors v. Smith, 253 F.Supp. 980 (E.D.Pa.1966), aff'd, 392 F.2d 577 (3d Cir. 1967). Accordingly, this court must apply that state law which the forum state would apply. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Pennsylvania courts look to the place with the most significant relationship to the parties and the transaction or the "center of gravity" of the contract. Neville Chemical Co. v. Union Carbide Corp., 422 F.2d 1205 (3d Cir. 1970). The parties to this litigation agree that the applicable law in this case is that of the State of New York.

tons"—is doubtful or ambiguous. Otherwise, parol evidence is inadmissible.

This interpretation finds no support within the four corners of the writing. In fact, such an interpretation would contradict the term which clearly limits plaintiff's obligation to tender "not less than 100 tons." Moreover, the court, in construing the agreement, looks to the intent of the parties as expressed in the writing, not to the so-called "real" intent. Hutchison v. Ross, 262 N.Y. 381, 187 N.E. 65 (1933).[4]

Plaintiff is in an anomalous position. On the one hand, it asserts that the writing is a valid contract yet denies that the writing embodies the actual contractual rights and obligations which the parties intended to make. Such a position, except for the purpose of reforming a contract, is untenable. Hutchison, supra. Therefore, plaintiff cannot assert the validity of the writing as a binding contract and simultaneously claim that an essential contractual term; to wit, an ascertainable quantity, should be added on the basis of prior negotiations.

In support of its position that parol evidence is inadmissible in this action, Penbrook directs the court's attention to paragraph 10 of the July 29, 1970 writing which states that "this contract supersedes all prior agreements between the parties hereto, whether oral or written and all such prior agreements are thereby cancelled." Clearly, this provision demonstrates the all-inclusive nature of the writing. Fogelson Et al. v. Rackfay Constr. Co., Inc., 300 N.Y. 334, 90 N.E.2d 881 (1950). Plaintiff's assertion that an "output" quantity term was agreed upon by the parties is in direct contradiction of the above-quoted merger clause and paragraph 2 of the writing.

In the face of the clear provisions of the contract which would be contradicted by the evidence which plaintiff seeks to offer, the court concludes that under the law of New York State the parol evidence rule precludes plaintiff's presentation of parol evidence.

We turn to plaintiff's contention that the court may imply a promise by Penbrook to haul the entire output of plaintiff's factory in Greenport, New York, and thereby fulfill the requirement of mutuality of obligation. The seminal case in this area is Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917). In that case the court found an implied promise on the part of the exclusive agent of Lucy, Lady Duff-Gordon to exercise his best efforts to promote the sale of goods endorsed by her. As Justice Cardoza said, "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. . . . The defendant gave an *exclusive* privilege. She was to have no right for at least a year to place her own indorsements or market her own designs except through the agency of the plaintiff. The acceptance of the *exclusive agency* was an assumption of its duties." (Emphasis supplied) 222 N.Y., at 89, 118 N.E. at 214.

That holding is inapplicable to the instant case for the reason that nowhere in the contract is Penbrook given the exclusive right to haul the product of plaintiff's Greenport factory. There was no express agreement that plaintiff would utilize the services of Penbrook to the exclusion of all others, or that plaintiff would tender its entire output to Penbrook. To imply a promise on Penbrook's part to transport the entire output of plaintiff's Greenport plant would have the effect of rewriting the contract. It is well settled that a court may not under the guise of interpretation, make a new contract for the parties. Rodolitz v. Neptune Paper Products, Inc., 22 N.Y.2d 383, 292 N.Y.S.2d 878, 239 N.E.2d 628 (1968).

4. The omission of a definite quantity term does not, in our opinion, automatically give rise to an ambiguity which would render parol evidence admissible to explain it.

Insofar as plaintiff promises to tender not less than 100 tons of product, there is an implied promise on Penbrook's part. The second "Whereas" clause of the contract expresses the ability and willingness of Penbrook to transport the products of plaintiff. Other provisions of the writing, such as Penbrook's promise to provide equipment and facilities for shipping the products, and the provisions for payment and termination compel such a conclusion. Any other interpretation would render such provisions meaningless. To quote again from Wood v. Lucy, Lady Duff-Gordon *supra*, 118 N.E. at 214, "a promise may be lacking, and yet the whole writing may be instinct with an obligation . . . . [citations omitted] If that is so, there is a contract."

The finding by the court that parol evidence is inadmissible to contradict the express term of the contract obligating plaintiff to tender and Penbrook to transport a minimum of 100 tons of products is dispositive of the matter before the court. It is undisputed that Penbrook had carried in excess of 100 tons of products by June 6, 1971, the date of the alleged breach. Penbrook was not contractually bound to accept for shipment any products in excess of the 100 ton minimum annual amount and therefore there was no breach of the contract.

Assuming, *arguendo*, that an implied promise to transport more than the minimum 100 tons of products could be found, the contract would, nonetheless, be unenforceable for indefiniteness. It is well settled that all the terms contemplated by an agreement need not be fixed with complete and perfect certainty for an agreement to constitute a contract. V'Soske v. Barwick, 404 F.2d 495, 500 (2d Cir. 1968) (applying New York law), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). However, a court cannot predicate an implied quantity term on pure speculation. There must exist an established trade or use in order to measure or make reasonably certain a quantity term which is otherwise uncertain. Nassau Supply Co. v. Ice Service Co., 252 N.Y. 277, 169 N.E. 383 (1929).

In the instant case there was no established business between the parties. It is undisputed that the amount of production at plaintiff's Greenport factory was uncertain because it was a new facility with no established output. As discussed previously, the void in this writing is too great to be filled by implying an output term as well as an exclusive dealing promise. In the absence of an established trade between the parties, the indefinite quantity cannot be expanded beyond its expressed minimum of 100 tons.

Plaintiff asserts that the subsequent conduct of the parties in this action should be considered in interpreting this agreement. However, the court need not look to subsequent conduct when the language of the agreement is unambiguous, as it is here. Brainard v. New York Central R. R. Co., 242 N.Y. 125, 151 N. E. 152 (1926).

Plaintiff alleges that the issue of lack of mutuality has been waived by Penbrook because the reason Penbrook terminated the contract was its unprofitable operation under the existing rate schedule, not because of any lack of mutuality in the contract.

The court has found that, under the contract, plaintiff was bound to tender 100 tons of product and Penbrook was obligated to transport 100 tons of product. Beyond that quantity, the writing merely represents an agreement of the parties establishing the terms which would govern the shipments of product which exceeded the minimum 100-ton annual amount. Accordingly, since Penbrook had already transported well over 100 tons of product, its refusal to accept later shipments did not constitute a breach of contract and therefore the doctrine of waiver is inapplicable.

The final matter before the court is Penbrook's counterclaim in the sum of $20,300.00 for services rendered. Plain-

tiff admits in paragraph 14 of its complaint that it owes Penbrook that amount. It is also evident from the complaint that, in calculating the damages claimed in the ad damnum clause, credit was given defendants in the amount of $20,300.00. The entry of summary judgment on the counterclaim in defendants' favor would have the effect of duplicating the $20,300.00 credit. However, since plaintiff has not contested defendants' motion for summary judgment on the counterclaim, it will be granted. In order to avoid manifest injustice, plaintiff will be granted leave to amend its complaint in order to recalculate the total amount of damages it seeks from defendants.

An appropriate order will be entered.

## APPENDIX

### CONTRACT

THIS CONTRACT, made and entered into this 29th day of July 1970, by and between INTERPACE CORPORATION (hereinafter called shipper) and PENBROOK HAULING COMPANY, INCORPORATED (hereinafter called carrier).

WITNESSETH:

WHEREAS, CARRIER is engaged in the transportation of property as a contract carrier by motor vehicle, and operates over the public highways of the State of New York under and pursuant to Permit No. MT–8810.

WHEREAS, SHIPPER desires to have Carrier transport, deliver and unload concrete pipe and related products produced by shipper, and Carrier is willing and able to furnish such transportation;

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained the parties hereto agree as follows:

1. Carrier shall provide equipment and facilities necessary to, receive and safely transport shipments of concrete pipe, fittings, and specials including, but not limited to, tees, elbows, wyes, and bands (used on concrete pipe for a change of direction) *under contract with Interpace Corporation:* Only for shipments from shipper's plant site in the town of Greenport (Columbia County) to job sites, construction sites, and temporary storage areas at all points in the state of New York and returned and rejected merchandise of the same description and dunnage in the reverse direction.

2. Shipper shall tender to Carrier each year during the term of this Contract for transportation by motor vehicle between points set forth in Item 1 above, not less than 100 tons of products described in Item 1 of this Contract.

3. Carrier's charges for the transportation performed by carrier under this Contract shall be as set forth in the attached Schedule A. It is understood and agreed that any change in such rates, fares or charges shall be subject to prior approval of shipper.

4. Carrier shall comply with any and all rules and regulations of the Interstate Commerce Commission and New York Public Service Commission insofar as the same pertain to services performed by carrier for shipper under this Contract.

5. Carrier will be responsible for the shipments and shall safely handle, transport and unload such shipments at the destination in the manner and location designated.

6. Carrier shall pay shipper for any loss or damage to products transported by it for shipper, while in possession of carrier, except such loss or damage as may be occa-

sioned by the nature of the products as agreed in advance in writing by shipper.

7. It is understood and agreed that carrier is an independent contractor and not an employee of shipper and that all persons operating vehicles or employed in connection therewith, whether owned, leased or hired by carrier, shall be employees of carrier.

8. Carrier will maintain at his own expense bodily injury insurance of at least $250,000 for injury to one person, and $500,000 for injury to more than one person for any one accident, and property damage insurance of at least $100,000. Certificates of insurance will be endorsed in terms which mean:

The policy is extended to cover the interest of the shipper as an additional assured.

The shipper will not be responsible for any premiums accrued under the policy.

The carrier will indemnify the shipper and hold him harmless against loss, damage, injury or other expense caused or claimed to have been caused by the carrier or the carrier's vehicles.

The policy and/or endorsements will not be cancelled or changed as they affect the interests of the shipper unless he is given 10 days prior notice.

The carrier must deliver these certificates of insurance to the shipper before any shipments can be made.

9. This Contract shall be in full force and effect for a period of one year from the date hereof, and from year to year thereafter, unless sooner terminated as herein provided. Carrier and shipper may at any time terminate this Contract by giving notice in writing to the other at least 60 days prior to the date of termination and by filing a copy of such notice with the New York Public Service Commission.

10. This Contract supersedes all prior agreements between the parties hereto, whether oral or written and all such prior agreements are thereby cancelled.

11. This Contract shall be binding upon the parties hereto, their heirs, administrators, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have subscribed their names the day and year first above written.

INTERPACE CORPORATION
By; _____
Title; Assistant Secretary

Witness: _____

PENBROOK HAULING COMPANY, INC.
By; _____
Title; President