**WASHINGTON HEIGHTS–WEST HARLEM–INWOOD MENTAL HEALTH COUNCIL, INC., Plaintiff,**

v.

**DISTRICT 1199, NATIONAL UNION OF HOSPITAL AND HEALTH CARE EMPLOYEES, RWDSU, AFL–CIO, Defendant.**

No. 83 Civ. 2495 (RWS).

United States District Court, S.D. New York.

April 27, 1984.

---

**1252**

Epstein, Becker, Borsody & Green, P.C., New York City, for plaintiff; Richard J. Reibstein, New York City, of counsel.

Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, for defendant; Vicki Erenstein, New York City, of counsel.

## OPINION

SWEET, District Judge.

Defendant District 1199, National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO, ("1199") has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., to enforce an arbitration award requiring plaintiff Washington Heights-West Harlem-Inwood Mental Health Council, Inc. (the "Council") to rehire and restore back pay to Edward Lane ("Lane"), a mental health worker and union delegate. The Council has cross-moved for summary judgment vacating the award. For the reasons set forth below, and with considerable misgiving, the Council's cross-motion will be granted, 1199's motion denied, and the arbitration award vacated.

There is no dispute between the parties with respect to the material facts which will be described chronologically. Where the parties differ as to non-material facts, those differences will be noted. 1199 is the collective bargaining representative of certain employees of the Council. The Council and 1199 were parties to a collective bargaining agreement dated May 2, 1979, covering the period January 1, 1979 to December 31, 1980. That contract expired by its own terms on December 31, 1980 and negotiations for a successor collective bargaining agreement commenced in late 1980 with the understanding that any agreement reached by the negotiators would be submitted to the board of the union membership for approval. The Council's By-Laws state that its Board of Directors shall enter into contracts in the name of the Council to be signed by the chairperson of the Council in its name.

On or about April 17, 1981, the parties' bargaining committees reached agreement as to the terms of a proposed collective bargaining agreement to cover the period January 1, 1981 to June 30, 1982. On or about May 6, 1981, the parties signed a "Memorandum of Agreement Covering Salary Increases and Minimum Classification Schedules for the Contract Period January 1, 1981 through June 30, 1982."

The Council implemented the terms agreed upon by the parties, including: a 7% wage increase retroactive to January 1, 1981; a $500 increase in classification minimums; an increase in the minimum wage differential upon promotion from $4.00 to $5.00; and the elimination of a $6.00 weekly subminimum differential for probationary employees. Throughout the period January 1, 1981 to June 30, 1982, the Council paid benefits in amounts and under terms specified in the union draft contract, provided union membership cards and dues check-off authorization forms to newly hired employees, required employees to become members of 1199 within thirty (30) days of their hire and supplied the union with copies of all notices of job openings for bargaining unit positions. The Council remitted union dues and paid monthly contributions to the union benefit fund on behalf of bargaining unit employees.

Throughout the period January 1, 1981 to June 30, 1982, grievances at the Step 2 level were aired between the employee involved, his supervisor, the Council's executive director, an 1199 delegate and the Grievance Committee of the Council. A

representative of 1199 dealt with Step 3 grievances. Correspondence between the parties during this period referred to an agreement. The parties participated in three arbitrations during 1982.

In December 1981, the Council was given a 71-page contract draft by 1199 containing, among other provisions, a continuation of arbitration procedures for grievances. On January 18, 1982, the Council wrote to 1199 seeking changes in the proposed agreement, changes unrelated to the arbitration and grievance procedures.

On January 5, 1982, Lane received a letter of reprimand, and on April 20, 1982, Lane was suspended. On May 13, 1982, 1199 sought the designation of an arbitrator from the American Arbitration Association for the Lane dispute. The distinguished arbitrator George Fowler ("Fowler") was agreed upon by the parties, and the arbitration was scheduled for August 4, 1982.

On June 16, 1982, 1199 forwarded a second draft contract to the Council, and on July 26, 1982, representatives of 1199 and the Council met to resolve a number of outstanding issues concerning the June 1982 contract draft. A number of subjects were discussed: (1) the hiring hall provision, (2) an on-call pay clause in the definition of "regular pay," (3) language regarding wage increases, (4) eligibility for sick leave, (5) maternity leave, (6) temporary employees and "bumping" rights in the event of layoffs and recalls, (7) the "bumping" provision in the seniority clause, and (8) job reclassification. A dispute exists as to whether five other issues were discussed: (1) the parties' side letter on training and upgrading, (2) coverage of clerical and service and maintenance employees, (3) notification for entitlement to sick leave, (4) length of probationary period, and (5) training of family health coordinators and medical and dental assistants. On August 3,

1982, another contract draft was delivered to the Council by 1199.

In October or November, 1982, Council Board Chairman William H. Hatcher issued a public statement that the parties had negotiated a 1981–1982 contract, and that the Council had implemented all of its terms, including the processing of grievances and the submission of unresolved grievances to arbitration.

On August 4, 1982, Fowler recused himself as arbitrator because he knew one of the members of the Council Board of Directors, Emma Bowen, and had been questioned by 1199 on the relationship.[1] On August 5, 1982, the Council wrote a letter to 1199's attorney refusing to go forward with the Lane arbitration on the grounds that no agreement to arbitrate existed. The arbitrator subsequently appointed held a hearing on November 19, 1982, which the Council did not attend. On January 7, 1983, the arbitrator handed down an eleven-page award, directing reinstatement and back pay for Lane. It is that award which is at issue here.

On January 12, 1983, a fourth contract draft was submitted to the Council from 1199. The draft submitted by 1199 on August 3, 1982 differs from the January 12, 1983 draft with respect to the job reclassification clause. To date, no successor collective bargaining agreement to cover the period January 1, 1981 to June 30, 1982, or from July 1, 1982 thereafter, has ever been submitted to or approved by the Council Board of Directors or signed by the parties.

On January 19, 1983, the Council filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") concerning 1199's failure to reduce the terms agreed upon in the negotiations to writing. On January 31, 1983, 1199 filed an unfair labor practice charge alleging that the Council had refused to sign a

---

1. As luck would have it, I too know Ms. Bowen, although until reading Fowler's recusal memorandum included as an exhibit in the submitted affidavits, I was unaware that she was a member of the Council Board of Directors. My acquaintance with her was during the mid-1960's, and I have had no contact with her since that time. That relationship, although warm at the time, is too distant in time and relevance to require my recusal now.

collective bargaining agreement whose terms had been agreed on.

On March 31, 1983, the Regional Director of the NLRB stated that no further proceedings were warranted on the Council's charge, stating further as follows:

Paragraph one of your charge alleges that the above-named Union has failed to bargain in good faith with Washington Heights-West Harlem-Inwood Mental Health Council, Inc. (herein called "the Employer"), by failing to reduce to writing and improperly reducing to writing terms agreed upon in negotiations for a collective bargaining agreement covering the period from January 1, 1981 to June 30, 1983. The evidence fails to establish that the Union violated the Act in such manner.

Rather, the evidence establishes that the Employer and the Union (herein also collectively called the parties) both contend that they reached agreement on the terms of a collective bargaining agreement in April, 1981. Since that time, the Union has submitted four drafts of the contract to the Employer and requested that the drafts be reviewed and executed. Each time a draft was presented, the Employer noted certain problems with the document. The evidence establishes that more than thirteen disputes over the language of the contract were expressed to the Union by the Employer at various times. Concerning the numerous disputes over contract language, it appears that when at least eight of these matters were brought to the Union's attention, during a meeting in July 1982, the Union promptly resolved them to the satisfaction of the Employer. As to the remaining five unresolved issues, the evidence tends to show there was no meeting of the minds on those issues. Thus, on most of those issues, although the parties agreed on the substance of the proposals, there was no agreement on how those matters would be set forth in the contract or implemented. It also is significant that the collective bargaining agreement referred to in paragraph one of your charge has now expired, by its own terms, although it was never signed, and it would appear that no substantial purpose would be furthered by trying to discern at this time what agreement, if any had been reached. Accordingly, it was concluded further proceedings on this aspect of your charge were not warranted. The remaining issues on the expired contract can be resolved by the parties in their negotiations over a new agreement to the extent they remain relevant.

## Conclusions of Law

These facts present in a collective bargaining context the issues this court found troubling and perplexing in *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir. 1984), namely, what is a contract, and when is it formed?

It is undisputed here that the parties reached an agreement, labor peace descended in its customarily uncertain fashion, and it was expected that the formalities of contract formulation and execution would follow. They did not.

Both parties relied upon their agreement, reached during collective bargaining and seemingly respected by the Council's performance of the wage increase and union security provisions. The Council achieved labor peace of a kind and relied on the grievance and arbitration procedures to keep the peace. Indeed, the Council participated in the very arbitration at issue here by selecting an arbitrator, and only on the eve of the adjourned arbitration did the Council determine to rely on the failure of the parties to execute a satisfactory collective bargaining agreement covering the relevant period. Even after electing not to participate in the arbitration, some seven months after the expiration of the putative contract the Council sought to charge 1199 with an unfair labor practice for not executing the contract, a charge which would have had relevance only if the validity of the contract remained at issue.

In the instant motion, 1199—quite properly, in the court's view—has relied princi-

pally upon *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), which declared that the parties' intentions would prevail over the formalities of contract execution when the execution of a contract was clearly intended by the parties. Unfortunately for 1199 and for the court, the Court of Appeals' decision in *Reprosystem* has cast doubt on the vitality of *V'Soske*, at least as far as this court is concerned.[2]

The result here is also compelled by *Globe Seaways, Inc. v. National Marine Engineers' Beneficial Ass'n*, 451 F.2d 1159 (2d Cir.1971), which, in consonance with *Reprosystem*, stressed the requirement of fulfilling the formalities of a collective bargaining agreement. The *Globe Seaways* Court noted the union's inconsistencies in disavowing the agreement through a strike and then seeking to enforce arbitration. It could be said that the Council's positions here are similarly inconsistent.

■■■■ There certainly is authority for the proposition that even in the absence of an executed collective bargaining agreement the parties can agree to arbitrate and that such an agreement is severable. *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 410 (2d Cir.1959), *cert. dismissed*, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); *International Union of Operating Engineers, Local Union No. 139 v. Carl A. Morse, Inc.*, 529 F.2d 574, 578 (7th Cir.1976). These authorities are, of course, reinforced by the policy favoring arbitration generally and particularly in the collective bargaining context. *See Robert Lawrence*, 271 F.2d at 410. However, despite these principles, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warri-*

*or & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). "The duty to arbitrate is wholly contractual and the courts have the obligation to determine whether there is a contract imposing such a duty." *Procter & Gamble Independent Union of Port Ivory, N.Y. v. Procter & Gamble Manufacturing Co.*, 312 F.2d 181, 184 (2d Cir.1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). These motions present the court with just that obligation.

Given the facts set out above, a holding that a contract existed seems desirable, especially in view of this court's preference, expressed in *Reprosystem*, 522 F.Supp. 1257 (S.D.N.Y.1981), for intent rather than contract formalism. However, the reversal in *Reprosystem*, with its consequent weakening of the *V'Soske* principle, together with the similarity between the issues here and those presented by *Globe Seaways*, carry the day for formalism. While it is true that, in appropriate cases, "the Court must look to the parties' behavior ... to determine the question of the existence of a valid agreement," *New York Typographical Union No. 6 v. Triangle Publications, Inc.*, 108 Lab.Rel.Reference Manual 2911, 2915 (S.D.N.Y.1978), *aff'd mem.*, 108 Lab.Rel.Reference Manual 2924 (2d Cir.1980), this is not such a case. The parties had an implicit agreement to arbitrate grievances, indeed one that was performed in part, and the Council performed other parts of the agreements. However, the union submitted four drafts to the Council, none of which were signed.

■■■■ These facts indicate, as the NLRB stated, that there was no formal "meeting of the minds", and therefore there was no contract and no right to arbitration and its enforcement. A practice of arbitrating some grievances, like the practice of performing some of the proposed contract

---

**2.** In the appeal of *Reprosystem, V'Soske* was not overruled and the panel reversed the District Court on a factual finding, namely that there was no evidence of an intent to be bound absent the execution of the expected agreement. However, after a nonjury trial, the District Court found facts demonstrating such an intent (the

handshake, the conversations and the finality of the drafting process). The Court of Appeals' failure to consider these facts does not distinguish *Reprosystem* from *V'Soske* but, at least as far as the court is concerned, demonstrates that the principle enumerated in *V'Soske* has lost vitality.

**1256**

terms in *Procter & Gamble* and *Globe Seaways*, does not constitute an agreement to arbitrate all grievances, absent the signed agreement. *See Procter & Gamble*, 312 F.2d at 184; *O'Connor Co. v. Carpenters Local Union No. 1408*, 702 F.2d 824, 825–26 (9th Cir.1983). Contrary to 1199's suggestion, this case is not similar to *United Steelworkers of America v. Bell Foundry Co.*, 626 F.2d 139, 141 (9th Cir. 1980), where there was "no question that the parties came to a 'meeting of the minds' on December 1 as to all of the operative terms of the contract [and] ... [a]ll that remained was a detail giving greater precision to the expression of one of the terms." The present facts are also distinguishable from those in *New York Typographical Union, supra*, where there was a single agreement which one side had signed, and the party contesting the existence of the agreement had previously sued the other party on the very agreement at issue.

Whether or not the purposes of labor peace will be served by a conclusion which requires contract execution, is beyond the power of prediction of this court. Certainly such a conclusion minimizes the possibility of error on the part of the fact finder.

The material facts of this matter are not in dispute, and disposition on summary judgment is thus appropriate. The motion of 1199 for enforcement of the arbitration award is denied, the motion of the Council to vacate the award is granted and judgment shall be entered for the Council. No costs shall be awarded.

IT IS SO ORDERED.