748 F.2d 105
 117 L.R.R.M. (BNA) 3095, 102 Lab.Cas. P 11,254
 WASHINGTON HEIGHTS-WEST HARLEM-INWOOD MENTAL HEALTH COUNCIL,
INC., Plaintiff-Appellee,
v.
DISTRICT 1199, NATIONAL UNION OF HOSPITAL AND HEALTH CARE
EMPLOYEES, RWDSU, AFL-CIO, Defendant-Appellant.
 No. 174, Docket 84-7473.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 9, 1984.
Decided Nov. 15, 1984.
 
 Richard L. Dorn, New York City (Sipser, Weinstock, Harper, Dorn & Leibowitz, Vicki Erenstein, New York City, of counsel), for defendant-appellant.
 Richard J. Reibstein, New York City (Epstein, Becker, Borsody & Green, P.C., Robert P. Borsody, New York City, of counsel), for plaintiff-appellee.
 Before FEINBERG, Chief Judge, and MANSFIELD and KEARSE, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 District 1199, National Union of Hospital and Health Care Employees (the Union) appeals from a judgment of the United States District Court for the Southern District of New York, Robert W. Sweet, J., granting summary judgment and vacating an arbitration award upon the motion of Washington Heights-West Harlem-Inwood Mental Health Council (the Council). The arbitration award, issued in January 1983, directed the Council to reinstate Edward Lane, a discharged employee, with full back pay. We reverse the judgment of the district court, 586 F.Supp. 1251, and remand the case for further proceedings.
 
 I.
 
 2
 The Council and the Union were parties to a two-year collective bargaining agreement that expired by its own terms on December 31, 1980. Negotiations for a successor contract began in late 1980, and in April 1981, the parties appeared to reach agreement on the terms of a new contract, which was to cover the period from January 1, 1981, to June 30, 1982. The Union was to prepare the written text of the new agreement.
 
 
 3
 The Union first submitted a draft of that text to the Council in December 1981. In the interim, and indeed through June 30, 1982, the Council largely adhered to the terms of the new, apparent agreement. Among other things, the Council implemented a retroactive wage increase, remitted dues to the Union, submitted payroll reports and made monthly contributions to the benefit fund. In addition, grievances were processed and disputes were submitted to arbitration.
 
 
 4
 On January 18, 1982, the Council wrote to the Union seeking changes in the December 1981 draft; none of the changes concerned grievance and arbitration procedures. Meanwhile, in early January 1982, Lane had received a letter of reprimand; in April 1982, he was suspended and then terminated. With regard to both the disciplinary warning and the discharge, the Union invoked the grievance procedure and then sought arbitration. The cases were consolidated, the parties agreed on an arbitrator, and after one postponement a hearing was scheduled for August 4, 1982.
 
 
 5
 On June 16, 1982, the Union delivered a second draft of the contract to the Council, and on July 26 the parties met to resolve remaining problems with that draft. On August 3, 1982, the Union submitted a third draft to the Council.
 
 
 6
 On August 4, 1982, before the hearing in the Lane dispute began, the arbitrator recused himself because one of the Union's representatives had questioned his impartiality. The next day, the Council notified the Union's attorney by letter that it refused to participate further in the Lane arbitration because, it believed, no agreement to arbitrate existed. In November 1982, the successor arbitrator held a hearing, which the Council did not attend. On January 7, 1983, the arbitrator issued her opinion and award, directing the Council to reinstate Lane with full back pay.
 
 
 7
 On January 12, 1983, the Union submitted a fourth contract draft to the Council. None of the four drafts was ever signed by either party.
 
 
 8
 On January 19, 1983, the Council filed an unfair labor practices charge with the National Labor Relations Board (the Board), charging that the Union had failed to reduce the terms of the negotiated agreement to writing. The Board's Regional Director dismissed the charge, and the Council, pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, commenced this action to vacate the arbitration award. The Union counterclaimed under that Act to confirm the award, and both parties moved for summary judgment. The district court granted the Council's motion and vacated the award, finding that there had been "no formal 'meeting of the minds' " on the terms of the alleged 1981-82 agreement.
 
 II.
 
 9
 The key issue in the district court was whether the parties had agreed to submit to arbitration disputes arising in the 1981-82 period. The district judge stated that "the parties reached an agreement, labor peace descended in its customarily uncertain fashion, and it was expected that the formalities of contract formulation and execution would follow." The judge also noted that on the facts set forth above, "a holding that a contract existed seems desirable." Nevertheless, the court held that there had been no formal meeting of the minds. Apparently, the district judge felt constrained by our recent decision in Reprosystem, B.V. v. SCM Corp., 727 F.2d 257 (2d Cir.1984), which he believed had vitiated the principle of intent over formalism enunciated in V'Soske v. Barwick, 404 F.2d 495 (2d Cir.1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).
 
 
 10
 In V'Soske, which involved a contract for the sale of a business, the party seeking to avoid the agreement claimed that there was no intent to be bound until the signing of a formal document. This court summarized its view of the relevant contract law:
 
 
 11
 Two rules on this subject are well established: first, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.... Contract law has progressed and evolved sounder principles since the days of ritualistic and formalistic sealed instrument requirements. Thus, these rules, placing the emphasis on intention rather than form, are sensible and reasonable.
 
 
 12
 404 F.2d at 499 (citations omitted). Applying these principles, the court held that although the parties contemplated a formal document, they nevertheless intended to be bound in the interim. Id. at 499-500.
 
 
 13
 Reprosystem involved an alleged contract in a "complex transaction" for the sale of one party's foreign subsidiaries. In finding that no contract for the sale in fact existed, the Reprosystem court reaffirmed the principles enunciated in V'Soske, see 727 F.2d at 261, and, despite the concerns of the district court here, did not undermine them. Far from elevating contract formalism over the parties' intent, the court relied on specific evidence that the parties intended not to be bound before execution of a formal contract. Id. at 261-62. Here, both sides apparently agree that the mere fact that they contemplated memorializing their agreement in a formal document does not, without more, prevent the agreement from binding them in the interim. Reprosystem is thus inapposite.
 
 
 14
 The district court also suggested that its decision was compelled by National Marine Engineers' Beneficial Ass'n v. Globe Seaways, Inc., 451 F.2d 1159 (2d Cir.1971), which it believed "stressed the requirement of fulfilling the formalities of a collective bargaining agreement." Globe Seaways did hold that the implementation of various terms of a purported agreement does not by itself cause a labor contract to arise, 451 F.2d at 1163, and to that extent it may be relevant here. Nevertheless, in Globe Seaways the court found that the parties had explicitly manifested an intent not to be bound until the union supplied written notification that the agreement had been ratified. No such notification was forthcoming. Id. at 1161-62. Here the question is whether the Union and the Council reached an agreement, not whether an acknowledged agreement would be binding absent the occurrence of some subsequent event.[1]
 
 
 15
 Thus, the district court's reliance upon Reprosystem and Globe Seaways in finding that there had been no "meeting of the minds" was apparently misplaced. We cannot say how it would have decided what the understanding of the parties was in April 1981, absent reliance on those cases. The record before us admits of several possibilities.
 
 
 16
 At one end of the spectrum is the possibility, urged by the Union, that the parties in fact reached agreement on all material terms, including the right to arbitrate grievances. Under this view, the parties' subsequent inability to reduce the agreement to writing must be ascribed to the influence of extraneous factors, perhaps including the need to negotiate still another collective bargaining agreement covering the period beginning July 1, 1982. If the Union is correct, the Council was bound to arbitrate the Lane grievance, and the arbitrator's award should be confirmed.
 
 
 17
 At the other end of the spectrum is the possibility, urged by the Council, that while the parties thought they had reached agreement in April 1981, the Union's subsequent contract drafts indicated that there had not been a meeting of the minds after all. Consequently, there was no collective bargaining agreement in effect when the Lane grievance arose in April 1982. Under this view, according to the Council, there was no agreement to arbitrate covering the period in question; the arbitrator was therefore without jurisdiction and her award should be vacated. While this position is not without force, and while it does serve to explain why the Council, in the period after April 1981, put key terms of the alleged agreement into effect, there may be equitable considerations arguing against it. The Council not only apparently abided by the provisions of the purported agreement for its entire term, but it may have also benefited substantially from the mutual assumption that there was an agreement, by achieving, as the district judge pointed out, "labor peace of a kind."
 
 
 18
 There is also the intermediate possibility that the parties did reach an oral understanding on a successor collective bargaining agreement, even though there might not have been a meeting of the minds on all the details of that agreement. Under this view, which is also urged by the Union, the parties at least agreed to be bound by the grievance and arbitration provisions of the 1979-80 agreement while they attempted to reduce their successor agreement to writing. As the Council's attorney conceded at oral argument, there was no dispute over the terms of the arbitration clause. Moreover, after April 1981 the Council participated fully in at least two arbitrations, apparently never claiming that no agreement to arbitrate existed. Indeed, in one arbitration the Council's attorney submitted a posthearing summation dated July 19, 1982--well after the Union sought arbitration in the Lane dispute--in which he relied on a provision in the 1979-80 agreement concerning arbitration. The Council also participated in the preliminaries of the Lane arbitration, backing out only at the last minute. Finally, despite finding that no collective bargaining agreement existed, the district judge stated that "[t]he parties had an implicit agreement to arbitrate grievances ...." On the other hand, in response to the American Arbitration Association's request for the operative agreement in the Lane arbitration, the Union submitted not the 1979-80 agreement but another document. This weights against the Union's contention that the parties had agreed that disputes would be arbitrated under the 1979-80 agreement. In any event, if this intermediate possibility is the correct characterization of the parties' understanding, then the arbitrator had jurisdiction and her award should be affirmed.
 
 
 19
 The Union quite properly points out that Supreme Court decisions place collective bargaining agreements in a special class, see, e.g., John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), that such agreements are designed to settle questions that, if left unresolved, lead to industrial warfare, and that we should not, therefore, "force the give-and-take reality of labor relations into a strait-jacket of lawyers' technicalities." See Rabouin v. NLRB, 195 F.2d 906, 910 (2d Cir.1952). We by no means disagree with these propositions, nor do we suggest that the possible agreements outlined above are exhaustive. We set them out only to emphasize that neither Reprosystem nor Globe Seaways is dispositive of the determination that must be made as to whether or not an agreement to arbitrate disputes such as the one now before us was reached in April 1981.
 
 
 20
 For the foregoing reasons, we reverse the judgment of the district court and we remand for further proceedings consistent with this opinion. The district court is, of course, free to take evidence on the issues before it, if it so desires.[2]
 
 
 21
 The Council does argue that even if an agreement is found a genuine issue of material fact would remain as to whether the agreement was subject to the approval of the Council's board of directors. After remand, the Council remains free to raise this issue in the district court, which did not pass upon it.
 
 
 
 [2]
 In light of our disposition, we need not at this stage consider the Union's additional arguments that the Council either waived its right to claim that no agreement to arbitrate existed or is estopped from making that claim