**TVT RECORDS and TVT Music, Inc., Plaintiffs,**

v.

**The ISLAND DEF JAM MUSIC GROUP and Lyor Cohen, Defendants.**

**No. 02 CIV.6644.**

United States District Court, S.D. New York.

Feb. 13, 2003.

James E. d'Auguste, Akin, Gump, Strauss, Hauer & Feld, L.L.P., James Philip Chou, Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York City, Peter L. Haviland, Rhonda R. Trotter, Akin Gump Strauss Hauer & Feld, LLP, Los Angeles, CA, for Plaintiffs.

Michael T. Mervis, Proskauer, Rose, L.L.P., Mary Mulligan, Esq., Universal Music Group, Robert J. Eddington, Proskauer Rose LLP, Alexander Kaplan, Proskauer, Rose, L.L.P., New York City, for Defendants.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

On August 20, 2002, plaintiffs TVT Records and TVT Music, Inc. (collectively "TVT") commenced this action against defendants The Island Def Jam Music Group and its principal Lyor Cohen ("Cohen," and collectively "IDJ"), alleging copyright infringement and related state law claims. In an earlier proceeding in this litigation, the Court, after an evidentiary hearing on September 23, 24, and 30, 2002, granted in part and denied in part TVT's motion for a preliminary injunction directing IDJ not to interfere with the delivery of certain recordings at issue here. IDJ now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and, in the alternative, for partial summary judgment under Rule 56 and for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In an Order dated February 4, 2003 this Court granted in part and denied in part IDJ's motion and indicated that its findings, conclusions, and reasoning would be detailed in a subsequent decision. Accordingly, the Order of February 4, 2003 is amended to incorporate the discussion set forth below.

## I. BACKGROUND

This case arises from a licensing dispute between TVT and its principal Steve Gottlieb ("Gottlieb") and IDJ concerning the distribution and exploitation of musical works created by Jeffrey Atkins, who is professionally known as Ja Rule ("Ja Rule"), and Irving Lorenzo, who is professionally known as Irv Gotti ("Gotti," and together with Ja Rule, the "Artists").[1] Under an agreement dated March 2, 1998 (the "Ja Rule Agreement") between IDJ's predecessor-in-interest, Rush Associated Recordings, and Ja Rule, IDJ is entitled to Ja Rule's exclusive services as a recording artist. Pursuant to an agreement dated February 11, 1999, which was extended by

---

1. This factual recitation is derived primarily from the parties' respective statements submitted pursuant to Local Rule 56.1. Additional citations to the record appear as necessary.

agreement dated December 17, 2001 between IDJ's predecessor-in-interest, Island/Mercury Records, and Gotti, IDJ is entitled to Gotti's services as a record producer and talent-finder.

In an agreement entitled "Heads of Agreement Between Murderers Inc./Irv Gotti And Jeffrey Atkins (p/k/a 'Ja Rule') And Tee Vee Toons, Inc. ("TVT")" dated July 2, 2001 (the "Heads of Agreement"), TVT contracted with Ja Rule and Gotti to record, produce, and exploit an album (the "CMC Album") featuring the performances of Ja Rule, Christopher Bristole ("Bristole"), and Otha Miller ("Miller," and collectively the "CMC Artists").[2] Under the Heads of Agreement, four previously recorded CMC tracks would be reworked and supplemented with at least eight newly recorded tracks featuring the CMC Artists, including Ja Rule, to comprise the CMC Album. The Heads of Agreement, through various guarantees and indemnities, charges the Artists with securing any approvals, consents, and permissions necessary for them to satisfy their obligations under this contract.

The delivery date for the new recordings as contemplated by the written Heads of Agreement was November 1, 2001. This delivery date was later changed to reflect the schedules of the Artists and the timing of other contemplated album releases. TVT and the Artists ultimately agreed that the new tracks would be supplied to TVT in time for release in November 2002. In the interim, the Artists continued to work on the new recordings for the CMC Album, and by May 2002, approximately eleven new tracks had been recorded. In May 2002, Ja Rule and Gotti announced a forthcoming release of the CMC Album. In the summer of 2002, IDJ included a promotional card in a compilation disc produced by Gotti which announced the forthcoming release of the CMC Album. Also in the summer of that year, Universal Music Publishing Group, an affiliate of IDJ, announced on its internet site the CMC Album's forthcoming release.

TVT recognized that IDJ's assent to the project envisioned by the Heads of Agreement (the "CMC Project") was necessary, and it accordingly endeavored to negotiate for IDJ's consent in mid-to-late 2001. In the process, Cohen and Gottlieb outlined a profit sharing arrangement. In a letter dated October 22, 2001, William Leibowitz ("Leibowitz"), outside counsel for TVT, sent IDJ execution copies of what TVT understood to be the written embodiment of an agreement in which IDJ assented to the CMC Project, termed the Side Letter Agreement (the "Side Letter"), and asked that they be signed and returned. TVT maintains that IDJ agents repeatedly assured Leibowitz that IDJ assented to the CMC Project and that executed copies of the Side Letter would be supplied. In a letter dated November 15, 2001, Leibowitz again asked IDJ to supply executed copies of the Side Letter, indicating that TVT had relied on representations of consent and assurances that executed copies would be forthcoming. In the spring of 2002, Leibowitz spoke with Brian Robinson of IDJ ("Robinson") about the Side Letter and IDJ's assurances, and Robinson indicated that he would inquire into the matter and then contact Leibowitz with an update. Executed copies of the Side Letter were

2. In 1994, Ja Rule, Bristole, and Miller performed together as a group known as Cash Money Click ("CMC") under contract with TVT. The group discontinued recording soon thereafter when Bristole was incarcerated. In 2001, after Bristol's release from prison, Ja Rule, allegedly in part to assist Miller's and Bristole's career development, opted to record a new album comprised of performances of these artists reunited again as CMC. Miller and Bristole had remained under contract with TVT.

never returned to TVT. Instead, in a letter from Robinson to Leibowitz dated August 14, 2002, IDJ informed TVT that IDJ was rejecting the agreement embodied in the Side Letter.

In or around June 2002, TVT granted IDJ's request for a license to use a musical composition and a TVT sound recording entitled "Get Tha Fortune" in a digital video disc entitled "Irv Gotti Presents: The Inc." TVT asserts that it relied on representations that IDJ had assented to the CMC Project, believing the publicity from IDJ's video disc would benefit the market performance of the CMC Album contemplated for release later that year. TVT granted IDJ permission to utilize this material prior to IDJ's written renunciation of the Side Letter.

## II. DISCUSSION

### A. STANDARD OF REVIEW

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See Rodriguez v. Hahn, 209 F.Supp.2d 344, 346 (S.D.N.Y.2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The role of the Court is not to resolve issues of fact but, rather, "to determine as a threshold matter whether there are genuine unresolved issues of material fact to be tried." Gibson v. Am. Broad. Cos., 892 F.2d 1128, 1132 (2nd Cir.1989). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matters that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323, 106 S.Ct. 2548. The nonmov-

ing party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," id., 477 U.S. at 324, 106 S.Ct. 2548, and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2nd Cir.1998). The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All ambiguities and reasonable inferences drawn from the underlying facts must be resolved in the light most favorable to the party opposing the motion. See United States v. One Tintoretto Painting Entitled "The Holy Family With Saint Catherine and Honored Donor", 691 F.2d 603, 606 (2nd Cir.1982) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

The standard for granting a Rule 12(c) motion for judgment on the pleadings is the same as that governing review of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted. In either case, the Court "must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2nd Cir.2001); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2nd Cir. 1998). Additionally, "[t]he court will not dismiss the case unless it is satisfied that the complaint cannot state any set of facts that would entitle [the plaintiff] to relief." Patel, 259 F.3d at 126; see Valmonte v.

*Bane,* 18 F.3d 992, 998 (2nd Cir.1994). In the course of its review, the Court may refer "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Tech., Inc.,* 987 F.2d 142, 150 (2nd Cir.1993) (citation omitted); *see Bernstein/Glazer, LLC v. Babbitt,* No. 99 Civ. 1195, 2000 WL 322778, at *3 (S.D.N.Y. March 28, 2000).

## B. *COPYRIGHT INFRINGEMENT*

TVT alleges copyright infringement in IDJ's use of "Get Tha Fortune," which TVT owned, in the "Irv Gotti Presents: The Inc." video. IDJ asserts in defense that it received a license from TVT for its use of this material. TVT responds that this license was fraudulently obtained by IDJ and therefore invalid. Gottlieb, TVT's principal, testified at the preliminary injunction hearing that TVT would not have granted IDJ this license in the absence of IDJ's representations of assent to the CMC Project and assurances that execution copies of the Side Letter would be produced. (Declaration of Pamela Gurley dated January 17, 2003 ("Gurley Decl."), Ex. A at 300–301, 313–314.)

■ A fraudulently induced copyright license is invalid. *See, e.g., Topps Chewing Gum, Inc. v. Imperial Toy Corp.,* 686 F.Supp. 402, 406 (E.D.N.Y.1988). Fraudulent inducement under New York law requires that TVT establish, among other things, that TVT actually relied on representations by IDJ and that such reliance was reasonable. *See Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 310 (2nd Cir.1994); *Computerized Radiological Servs. v. Syntex Corp.,* 786 F.2d 72, 76 (2nd Cir.1986). IDJ argues that the record presents no disputed issue of material

fact as to these two elements, and that the evidence compels the Court to reject TVT's asserted invalidity of IDJ's license. The Court disagrees.

### 1. *Reliance On The Asserted Representations*

■ Assuming for purposes of argument that IDJ in fact did make certain representations amounting to assent to the CMC Project, IDJ argues that the evidence compels a finding that TVT did not rely on any such representations when it granted IDJ permission to use "Get Tha Fortune." IDJ points to testimony by Leibowitz who stated that when structuring the terms of the Heads of Agreement, he included certain strong guarantees and indemnification clauses that imposed on the Artists the obligation to secure any necessary permissions and approvals. (Declaration of Robert J. Eddington dated November 18, 2002 ("Eddington Decl."), Ex. I at 56–57.) IDJ argues that because the onus was on Ja Rule and Gotti to obtain any necessary permissions and produce the musical works, TVT's decision to license "Get Tha Fortune" did not depend on assurances by IDJ that it consented to the CMC Project.

While the Artists may have been responsible to TVT for any losses of investment if the CMC Project were it to fail, such indemnification is clearly not the reason TVT entered into the Heads of Agreement. Rather, TVT's goal was to distribute and exploit the CMC Album; any indemnification owed to TVT by the Artists is quite obviously a fallback safety provision. Accordingly, assuming representations and assurances amounting to IDJ's assent were made, a reasonable jury could conclude that TVT relied on them in pursuit of this superior result, namely, the exploitation of the CMC Album.

Furthermore, TVT asserts a second benefit arising from these assurances that induced it to grant IDJ the license: publicity. Bryan Leach ("Leach"), a TVT executive, testified at the preliminary injunction hearing on this matter that the summer release of IDJ's video would help to prepare and excite the market for a November release of the CMC Album. (Gurley Decl., Ex. A at 38.) Assuming the representations and assurances asserted by TVT actually occurred, and that the CMC Album was to have been distributed and exploited by TVT, then this marginal increase in market performance also would have benefitted TVT.

In light of these added potential benefits, the Court concludes that IDJ's argument, that the obligations imposed upon the Artists by certain indemnification and guarantee provisions of the Heads of Agreement preclude a finding that TVT relied on the asserted representations and assurances by IDJ, must be rejected.

### 2. Reasonableness of TVT's Reliance

■ Turning to the question of the reasonableness, IDJ relies on the Second Circuit's decision in *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2nd Cir. 1984), to argue that, even assuming IDJ made the representations and gave the assurances TVT claims, the impending written memorialization of this putative arrangement in the form of the Side Letter precludes, as a matter of law, a finding that an oral agreement was made in advance. IDJ's argument misconstrues the law.

In *Reprosystem*, the Second Circuit began its pertinent analysis by referencing the well-settled tenet of New York contract law holding that "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.... These rules, placing the emphasis on intention rather than form, are sensible and reasonable." *Reprosystem*, 727 F.2d at 261 (quoting *V'Soske v. Barwick*, 404 F.2d 495, 499 (2nd Cir.1968)). The Second Circuit then reversed the district court's finding of an agreement in the absence of executed final drafts of the parties' contract. In so doing, however, the Second Circuit made it plainly clear that it did so because "a mistake was made by the district court ... because the documents and testimony clearly showed that the *intent of both parties was not to be bound prior to the execution of a formal, written contract.*" *Id.* at 261–62 (emphasis added). Propounding on its application of this doctrine, the Second Circuit, in an opinion issued nine months later, explained:

> In finding that no contract for the sale in fact existed, the *Reprosystem* court reaffirmed the principles enunciated in *V'Soske, see* 727 F.2d at 261, and ... did not undermine them. Far from elevating contract formalism over the parties' intent, the court relied on specific evidence that the parties intended not to be bound before execution of a formal contract. *Id.*, at 261–61. Here, both sides apparently agree that the mere fact that they contemplated memorializing their agreement in a formal document does not, without more, prevent the agreement from binding them in the interim. *Reprosystem* is thus inapposite.

*Washington Heights–West Harlem–Inwood Mental Health Council, Inc. v. Dist. 1199, Nat'l Union of Hosp. and Health Care Employees, RWDSU, AFL–CIO*, 748 F.2d 105, 107 (2nd Cir.1984).

IDJ has offered no evidence that compels the conclusion that IDJ and TVT agreed not to be bound until written contracts were executed. IDJ references language in letters sent to IDJ by Leibowitz

that IDJ interprets as evidence of preconditions to final written approval, but the Court's reading of this language yields another possibility, namely, that Leibowitz was simply discussing logistics concerning the implementation and memorialization of a previously arranged agreement. For example, perhaps the most compelling passage referenced by IDJ in support of its proposition that any acceptance was conditioned on a final, executed, written contract, reads:

> As you know, for some weeks now, I have been awaiting from you copies of the agreement pertaining to [the CMC Album project].... It would be most appreciated if you would take the time to get these copies back to me *so that I can close this matter out and not have to continue to follow-up*.... I look forward to receiving the copies *this week* so that we can be finished.

(Memorandum Of Law In Support Of Motion For (1) Summary Judgment On The Copyright Infringement Claim And Dismissal Of The State Law Claims For Lack Of Subject Matter Jurisdiction Or, In The Alternative, (2) Partial Summary Judgment And Judgment On The Pleadings On Certain Of The State Law Claims dated December 20, 2002 ("IDJ Br.") at 9 (quoting Eddington Decl., Ex. M) (former emphasis added; latter emphasis in original)). This excerpt appears in a letter dated November 15, 2001, and, according to TVT, was sent after a period of several months during which not only did TVT reach an oral agreement with IDJ but also during which it received repeated assurances that a formal, written version of what the parties had arranged would be forthcoming. (Gurley Decl., Ex. A at 189–91, 298; *id.*, Ex. B at 70.) This letter also

was sent following at least one other written request of its kind from Leibowitz to IDJ dated October 22, 2001. (Eddington Decl., Ex. L.) With this backdrop, the highlighted language can reasonably be interpreted as Leibowitz's efforts to tie up a loose end in the otherwise completed arrangement; the term, "close out," does not necessarily mean the written contract was a condition to the parties' agreement as IDJ suggests. The question of agreement being conditioned on the execution of a formal, written contract is therefore a disputed issue of fact about which reasonable people may differ, and thus a question for a jury to resolve.

IDJ also references a telephone call between Robinson and Leibowitz that took place during the spring of 2002 in which Leibowitz again attempted to followup on the execution copies of the Side Letter and during which he asked Robinson, "What ever happened to my signed document?" (IDJ Br. at 10; Eddington Decl., Ex. A at 194–95.) IDJ interprets this question as evidence that TVT, through Leibowitz, "was fully aware that IDJ was not going to honor its alleged assurance that it would return a signed copy of the Side Letter" [before TVT granted IDJ a license for "Get Tha Fortune."][3] (IDJ Br. at 10.) With this knowledge, the argument goes, reliance on TVT's claimed representations and assurances by IDJ was unreasonable.

While Leibowitz's question speaks to the return of the written Side Letter in executed form, it does not speak, one way or another, to the dispute over whether the Side Letter itself was simply a written memorialization of an otherwise existing oral agreement or whether the Side Letter's execution was a precondition to any such agreement. Additionally, to the ex-

---

**3.** This telephone call occurred before TVT granted IDJ permission to use "Get Tha For-
tune."

tent that IDJ attempts to deduce the states of mind of TVT principals from Leibowitz's question, the Court notes that TVT prior to this telephone call had expended various forms of resources in furtherance of the CMC Project, including recording and studio expenses in January, March, and May 2002. (Gurley Decl., Ex. A at 38; *id.,* Ex. D, F, G.) Leach testified that at this time, the production of the CMC Album was underway because TVT believed that IDJ had assented to the CMC Project. (Gurley Decl., Ex. A at 38.) These activities and expenditures may permit a jury to conclude that TVT reasonably believed in the existence of a valid oral agreement. IDJ's argument that TVT's reliance was unreasonable because TVT knew IDJ would not honor any claimed assurances or representations must therefore be rejected.

IDJ references other aspects of the events surrounding this protracted series of transactions as evidence compelling a conclusion that TVT's alleged reliance was unreasonable. In this vein, IDJ asserts that the negotiations surrounding the Side Letter and the "Get Tha Fortune" license were distinct, that they were separated by several months, and that the bulk of the assurances and representations TVT alleges occurred prior to November 15, 2001. Each of these details, while arguably tending to lend some support to IDJ's argument that TVT's reliance was unreasonable, cannot be viewed as so persuasive as to compel a conclusion as a matter of law that no genuine issue of disputed fact exists in light of the evidence concerning the progress of the CMC Project discussed in the preceding paragraph.

For these reasons, the Court concludes that on this record there exist disputed issues of fact concerning TVT's reliance and reasonableness. A jury must resolve these issues as it considers IDJ's defense of its having obtained TVT's permission against TVT's allegation of copyright infringement in regards to "Get the Fortune," a defense that cannot be sustained if TVT's permission in fact was fraudulently procured.

## C. TORTIOUS INTERFERENCE WITH CONTRACT

IDJ next challenges TVT's tortious interference with contract claim and raises three arguments. First, IDJ argues that any breach of the Heads of Agreement occurred on November 1, 2001 when the Artists failed to deliver material for the CMC Album for reasons TVT references as the Artists' "busy schedules." IDJ argues that because the breach occurred in November 2001, any subsequent interference alleged by TVT cannot form the basis for tortious interference. Second, IDJ argues that any interference was justified by IDJ's superior economic interest. Third, IDJ claims that it (IDJ) was a party to the Heads of Agreement and cannot, therefore, be liable for allegedly interfering with its own contract. The Court addresses these arguments in turn.

### 1. Timing Of The Breach

To state a claim for tortious interference under New York law, a plaintiff must establish the following elements: (1) the plaintiff was a party to a valid contract; (2) the defendant knew of this contract; (3) the defendant improperly and intentionally procured a breach of this contract; and (4) the plaintiff suffered damages as a result of the breach. *See, e.g., Albert v. Loksen,* 239 F.3d 256, 274 (2nd Cir.2001); *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97, 99 (1956). IDJ's first argument challenges TVT's evidence regarding the third element. This argument, however, overlooks TVT's claim that, while the Heads of

Agreement originally contemplated a November 2001 delivery date, the parties did not treat this missed delivery date as a breach and, instead, agreed to modify this delivery term of the Heads of Agreement to accommodate the schedules of Ja Rule and Gotti. (Gurley Decl., Ex. A at 346.) In support, TVT points to the fact that the Artists continued to record tracks well after November 2001, that TVT paid for the expenses incurred during these recording sessions, and that TVT and Gotti agreed in May of 2002 on a delivery date in time for a November 2002 release of the CMC Album. (Gurley Decl., Ex. D, F, G, and M; *id.*, Ex. A at 346–50.)

Additional evidence supports TVT's assertion. For example, an insert announcement circulated within the Irv Gotti compilation disc, distributed by IDJ in the summer of 2002, promotes a November 2002 release date for the CMC Album, (Gurley Decl., Ex. I at 3), and the Universal Music Group's website announced a November 2002 release as well, (Gurley Decl., Ex. K). The record also indicates that Ja Rule announced the upcoming release of a CMC Album during an interview with MTV News in May 2002. (Gurley Decl., Ex. E.) Also in May 2002, the Artists took part in a photo shoot, paid for by TVT, to promote the CMC Album. (Gur-

ley Decl., Ex. H.) Furthermore, TVT cites to language in paragraph B.4 of the Ja Rule / Recording Agreement Amendment dated August 5, 2002 as evidence that IDJ believed and knew as of August 2002 that TVT and the Artists were proceeding with the CMC Project.[4] (Gurley Decl., Ex. N; *see also* Eddington Decl., Ex. D, ¶ 18.) This evidence is more than adequate to refute IDJ's claim, that no interference is possible with a contract that has already been breached, because a jury could reasonably find that it supports TVT's contention that the Heads of Agreement in fact remained in effect beyond November 2001. It renders the matter a genuine issue of disputed fact.

### 2. *Economic Justification*

■ IDJ next argus that, assuming it did interfere with TVT's contract, any such interference was justified by its superior economic interest in the marketability of the Artists. TVT acknowledges the economic justification defense under New York Law, (Plaintiffs' Memorandum In Opposition To Defendants' (1) Motion For Summary Judgment On Plaintiffs' Copyright Infringement Claim And Dismissal Of The State Law Claims For Lack Of Subject Matter Jurisdiction Or, In The Alternative, (2) Partial Summary Judg-

---

4. This evidence may allow a reasonable jury to conclude that IDJ knew of the continuation of the Heads of Agreement, as required for TVT to maintain a tortious interference claim. IDJ argues that, in addition to knowledge of the continuation of the Heads of Agreement, TVT must show that IDJ consented to the new release date, arguing that TVT's tortious interference claim must be dismissed because TVT has neither alleged as much nor offered any evidence to that effect. IDJ's argument fails, however, because IDJ does not explain why, beyond its assent to the CMC Project generally, its assent to this specific detail, namely, the CMC Album's release date, is essential to the agreement embodied in the Side Letter. For example, the Court notes that the Side Letter

reads in relevant part: "In consideration for your agreement to comply with and honor all of the terms and conditions set forth in the [Heads of] Agreement (as same pertains to or affects you) and to permit 'Ja Rule', Murderers Inc. and Irv Gotti to perform for us and grant to us the rights set forth in the Agreement, you and we hereby agree as follows . . . ." (Reply Declaration of Michael T. Mervis dated January 29, 2003 ("Mervis Decl."), Ex. A.) The Side Letter contains no explicit reference to the CMC Album's release date, and, while it does reference the terms of the Heads of Agreement which specified a release in November 2001, IDJ has not shown how this term "pertains to or affects" IDJ in any material way.

ment And Judgment On The Pleadings Of The State Law Claims dated January 17, 2003 ("TVT Br.") at 12), but argues that this defense is unavailable to IDJ because IDJ acted fraudulently in the circumstances surrounding the breach of the Heads of Agreement. TVT also disputes the superiority of IDJ's interest. IDJ replies that fraudulent activity does not preclude the economic justification defense, and that courts can determine the superiority of the parties' economic interests before trial.

■ To begin, it is clear that fraud does preclude the economic justification defense to a tortious interference claim. The three cases to which the parties devote the bulk of their attention regarding this issue all indicate as much. *See, e.g., Blanchard v. Eisenpress*, 200 F.Supp.2d 334, 337 (S.D.N.Y.2002) ("Although plaintiffs have made a number of conclusory statements alleging fraud ..., nothing in the complaint asserts that [the defendants] acted in bad faith, or employed illegal means or in any way were involved in any wrongdoing."); *Foster v. Churchill*, 87 N.Y.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153, 157 (1996) (sustaining economic justification defense where lack of good faith did not rise to the level of "independent torts"); *Morse v. Swank, Inc.*, 493 F.Supp. 110, 117 (S.D.N.Y.1980) ("[T]he record provides no evidence of Swank's use of unlawful means from which a jury could conclude that Swank's interference, to the extent it existed, was not privileged or was otherwise wrongful."). In this case, TVT does allege fraudulent activity by IDJ, which this Court addresses in Section II.D *supra.* For these reasons and those discussed in Section II.D *supra,* the Court concludes that there exists a triable question of fact as to whether IDJ engaged in fraudulent activity that would preclude it from invoking the economic justification defense.

■ Furthermore, IDJ's assertion that it had a superior economic interest justifying interference assumes that there is no dispute as to whether IDJ assented to the agreement embodied in the Side Letter. If IDJ did assent, as TVT maintains, then the activities that TVT alleges constitute a procurement of a breach of the Heads of Agreement cannot be excused by a claim of economic justification because IDJ's economic interest would no longer be superior to TVT's interest in the CMC Album's exploitation. This conclusion follows, assuming TVT establishes assent, not only because IDJ's assent would carve out for TVT an exception to the exclusivity of IDJ's rights to the Artists' services, on which IDJ's superiority claim is based, but also because TVT's allegations include a profit-sharing agreement benefitting IDJ and thus rendering IDJ's economic interests in the CMC Album inextricably linked with, rather than superior to, those of TVT. For these reasons, the Court concludes that a disputed issue of fact exists concerning the superiority of the parties' economic interests and, in turn, the availability of the economic justification defense to IDJ.

### 3. Parties To The Heads Of Agreement

■ IDJ's third argument is that, taking TVT's assertion that IDJ assented to the agreement embodied in the Side Letter as true, IDJ itself became a party to the Heads of Agreement. Therefore, the argument goes, IDJ cannot be found to have tortiously interfered with its own contract.

The evidence indicates that TVT negotiated the Heads of Agreement with the Artists before negotiating the Side Letter

with IDJ.[5] Also, the Heads of Agreement, as IDJ itself points out, included various strong indemnification clauses and warrantees by the Artists and imposes on them the duty to secure any permissions or authorizations necessary for them to supply content for the CMC Album. (Eddington Decl., Ex. I at 56–57.) TVT promised, among other things, compensation in return. Accordingly, the Heads of Agreement includes terms defining rights and obligations enforceable as between the Artists and TVT independent of the Side Letter and that stand alone, in spite of IDJ's presence or absence as a party to the Heads of Agreement. The Side Letter incorporates the Heads of Agreement only to the extent that it "pertains to or affects" IDJ. (Mervis Decl., Ex. A.) For these reasons, the Court is not persuaded that it must take the Side Letter and the Heads of Agreement together as a single contract on the present record. Therefore, IDJ's argument that it cannot be held liable for tortiously interfering with its own contract must be rejected.

## D. *FRAUD*

IDJ also argues that TVT's claims for fraud must be dismissed on the pleadings as duplicative of its breach of contract claim. TVT responds that it has alleged independent grounds for fraud that are collateral to the underlying agreements. The Court agrees with TVT.

■ To state a claim for fraud under New York law, a plaintiff must establish that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suf-

fered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2nd Cir.1996) (citations omitted; internal quotations omitted). Where a plaintiff alleges both a breach of contract and a fraud claim arising from the same series of events, New York courts have been cautious in sustaining an independent fraud claim. The Second Circuit has instructed that, in order to maintain both, a plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract ...; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract ...; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages ...." *Id.* (citations omitted).

The Second Circuit has also cautioned that " 'simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim.' " *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 195 (2nd Cir.2001) (quoting *Best W. Int'l, Inc. v. CSI Int'l Corp.*, No. 94 Civ. 0360, 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994)). The Circuit Court has further elaborated, however, that:

> we find dispositive the New York Court of Appeals' distinction between ... "promissory statements as to what will be done in the future," which give rise only to a breach of contract claim, and ... false "representations of present fact," which give rise to a separate claim of fraudulent inducement.

---

5. The Heads of Agreement is dated as of July 2, 2001. (Eddington Decl., Ex. R.) According to Gottlieb, the negotiations with Cohen concerning the terms of the agreement embodied in the Side Letter occurred in August and early September 2001, (Gurley Decl., Ex. A at 70), and the Side Letter is dated as of September 24, 2001, (Eddington Decl., Ex. L).

*Stewart v. Jackson & Nash,* 976 F.2d 86, 88 (2nd Cir.1992) (quoting *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003, 1004 (1986)). In this vein, the New York Court of Appeals has declared that "[w]hile [m]ere promissory statements as to what will be done in the future are not actionable [in tort] . . ., it is settled that, if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact" upon which a fraud claim may be based. *Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906, 908 (1957) (citations omitted; internal quotations omitted). *See also U.S. East Telecomm., Inc. v. U.S. West Communications Servs., Inc.,* 38 F.3d 1289, 1301 (2nd Cir. 1994) (recognizing divergent case law). The New York Court of Appeals more recently confirmed that "[a] false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d 1179, 1184 (1995).

▆▆▆ In this case, TVT's allegations against IDJ are more consistent with the fact patterns at issue and the courts' reasoning in *Stewart, Sabo,* and *Graubard* because TVT claims that IDJ's actions reflected IDJ's ulterior motives independent of the bargain comprising the putative contract. TVT alleges that IDJ did more than simply fail to satisfy its putative obligations under the agreement embodied in the Side Letter. TVT claims that IDJ also concealed its intent not to follow through with these alleged obligations for a three-fold purpose: to placate Gotti while IDJ negotiated for an extension of Gotti's employment contract with IDJ; to induce TVT to grant IDJ permission to use "Get Tha Fortune" in IDJ's video release entitled "Irv Gotti Presents: The Inc."; and ultimately to acquire for itself the CMC Album content produced by the Artists for TVT.[6] Such concealment and ulterior motives are certainly related to the basis for TVT's claim for breach of contract, namely, IDJ's nonperformance of its putative commitment to authorize the CMC Project to go forward, in exchange for which IDJ would receive a share of the profits from CMC Album sales. Nonetheless, these additional benefits reflect sufficiently collateral purposes behind IDJ's putative representations and assurances so as to sustain an independent claim for fraud.

TVT's claims for fraud are not simply "dressed up" breach of contract claims. This is not a case where the defendant is alleged simply to have intended to derive the benefit of a bargain while, in the end, refusing to satisfy his own obligations. A reasonable jury could conclude that the activities TVT attributes to IDJ are indicative foremost of fraud, in the course of which a putative contract was utilized.

**6.** These allegations are rooted generally in TVT's complaint dated August 20, 2002 (the "Complaint"), (*see, e.g.,* Complaint, ¶¶ 1, 4, 6, 18, 22, 34, 44, 60, and 63), and were developed and articulated more fully during the preliminary injunction hearing and subsequent conferences before the Court. Because IDJ challenges TVT's fraud claims as precluded by law in light of TVT's assertion of breach of contract, and not on either factual sufficiency or Rule 8 notice grounds, the Court need not convert IDJ's motion for judgment on the pleadings into a motion for summary judgment. Instead, the Court will address IDJ's argument as a challenge to the legal, rather than factual, sufficiency of TVT's claims for fraud as presently developed. *See, e.g., Villante v. Dep't of Corr. of the City of New York,* 786 F.2d 516, 521 (2nd Cir.1986); *Motrade v. Rizkozaan, Inc.,* No. 95 Civ. 6545, 1998 WL 108013, at *3 (S.D.N.Y. March 11, 1998).

Because, according to TVT, IDJ had no good faith intention to perform under the contract but, rather, simply intended to delay TVT's business dealings with Gotti until after Gotti was re-signed to IDJ, the fact that the dilatory tool took the form of a putative contact does not obviate the alleged fraudulent nature of this tactic. If, as TVT maintains, IDJ intended to induce TVT to grant it a license for "Get Tha Fortune," the fact that such inducement took the form of a putative contract also does not preclude an otherwise viable fraud claim. Similarly, if, as TVT alleges, IDJ induced TVT into expending substantial resources in financing and arranging for the production of the CMC Album so that IDJ ultimately could appropriate it for its own use, the fact that the method employed to achieve such inducement was a putative contract would not render this scheme any less fraudulent. The Court concludes that, taking these allegations by TVT as true, as it must for purposes of IDJ's present motion, TVT's claims for fraud are not redundant of its claim for breach of contract. For these reasons, IDJ's challenge to TVT's fraud claims must be rejected.

## E. THE COVENANT OF GOOD FAITH AND FAIR DEALING

IDJ next argues that TVT's claim for breach of the covenant of good faith and fair dealing under New York law must be dismissed on the pleadings as duplicative of TVT's breach of contract claim. TVT responds that its claim for breach of the covenant exists as a separate cause of action distinct from its breach of contract claim and not based on the same allegations. The Court agrees with IDJ.

The New York Court of Appeals has instructed that

[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course

of contract performance.... Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included.... This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.... The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship.

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291–92 (1995) (citations omitted; internal quotations omitted). The Second Circuit has further counseled, with respect to this doctrine, that "[t]he boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2nd Cir.1989). The covenant does not exist in the absence of an underlying contract and is intended to serve "in aid and furtherance of other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 91 (1983); *see Alter v. Bogoricin,* No. 97 Civ. 0662, 1997 WL 691332, at *7 (S.D.N.Y.1997) ("[T]he covenant of good faith and fair dealing is not distinct from the underlying contract ....").

As this Court has previously ruled, a claim for breach of the covenant "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach ... of an express provision of the underlying contract." *EUA Cogenex Corp. v. North Rockland Cent. Sch. Dist.*, 124 F.Supp.2d

861, 873 (S.D.N.Y.2000) (citations omitted; internal quotations omitted); *Alter,* 1997 WL 691332, at \*7. Such a claim may be maintained "only if it is based on allegations different than those underlying the accompanying breach of contract claim." *Siradas v. Chase Lincoln First Bank, N.A.,* No. 98 Civ. 4028, 1999 WL 787658, at \*6 (S.D.N.Y. Sept. 30, 1999). The covenant protects a promisee not against a breach of the express terms of a contract but of the reasonable expectations and inferences otherwise derived from the agreement. *See Sauer,* 95 F.Supp.2d at 132 ("[S]uch a claim may be brought ... only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain."); *Restatement (Second) of Contracts* § 205, cmts. a, c (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party ...."); *see also* 2 A. Corbin, *Corbin on Contracts* § 5.27, at 134–40 (Rev. ed.1995).

■ In this case, the parties agree that IDJ ultimately withheld its written consent to the CMC Project. The issue to be determined by the jury is whether IDJ, before doing so, made representations and gave assurances of assent to the agreement embodied in the Side Letter, as TVT alleges in its Complaint. If a jury concludes that no such representations or assurances were given, in other words, that no contract between the parties, oral or otherwise, was created, then Robinson's letter to Leibowitz dated August 14, 2002,[7] expressing IDJ's lack of consent, is nothing more than a rejection of TVT's offer as embodied in the Side Letter. In this case, a claim for breach of the covenant of good faith and fair dealing cannot lie because no contract to which such good faith and fairness would relate would exist. *See, e.g., Murphy,* 461 N.Y.S.2d 232, 448 N.E.2d at 91 (covenant is intended to serve "in aid and furtherance of other terms of the agreement of the parties."); *Alter,* 1997 WL 691332, at \*7 ("[T]he covenant of good faith and fair dealing is not distinct from the underlying contract ....").

On the other hand, if a jury were to conclude that an agreement as embodied in the Side Letter was formed through the assertions, representations, and actions manifesting belief in the existence of valid agreements as alleged by TVT, then IDJ's letter of August 14, 2002, as well as other actions by IDJ inconsistent with the terms of any such agreement, would amount to a breach of this commitment. In this context, because IDJ's rejection letter would clearly constitute a repudiation or breach, TVT would have to point to other obligations reasonably understood and implied by the agreement embodied in the Side Letter, that IDJ's actions violated, as a basis to assert a breach of the covenant. *See EUA Cogenex Corp.,* 124 F.Supp.2d at 873; *Siradas,* 1999 WL 787658, at \*6. TVT alleges no such independent violations. Rather, it points to its expenditures made in furtherance of the CMC Project and in reliance on IDJ's alleged representations, and to its granting IDJ a license to use "Get Tha Fortune."

The time and resources TVT devoted to the CMC Project are the byproducts of IDJ's putative assent and alleged breach of contract, as is any perceived harm to reputation and business standing. However, these potential damages do not constitute an independent basis for a violation of the presumed agreement embodied in the Side Letter. Accordingly, such losses cannot sustain a claim for breach of the covenant because they are not independent of the putative breach of contract.

7. This letter is referenced in paragraphs 23 and 33 of the Complaint.

With respect to the "Get Tha Fortune" license, that contract was independently negotiated and executed, and nothing in the Side Letter can reasonably be interpreted as suggesting any specific obligations on the part of IDJ in regards to this separate arrangement.[8] *See Dalton,* 639 N.Y.S.2d 977, 663 N.E.2d at 291–92 ("Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included."); *Cross & Cross Props., Ltd.,* 886 F.2d at 502 ("The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract."). Therefore, while this license is, according to TVT, an independent consequence of the agreement embodied in the Side Letter,[9] it is not related to any obligations to which IDJ can reasonably be said to have committed itself if, as is presently assumed, it did enter into the agreement embodied in the Side Letter. Therefore, the "Get Tha Fortune" license cannot form the basis for a claim for breach of the covenant as regards this agreement. TVT has alleged no other basis for this claim. For these reasons, TVT's claim for breach of the covenant of good faith and fair dealing must be dismissed.

### III. CONCLUSION AND AMENDED ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Court's Order dated February 4, 2003 is amended to incorporate the discussion set forth herein; and it is further

**ORDERED** that the portion of IDJ's motion seeking summary judgment dismissing TVT's copyright infringement claims is DENIED; and it is further

**ORDERED** that the portion of IDJ's motion seeking summary judgment dismissing TVT's tortious interference with contract claims is DENIED; and it is further

**ORDERED** that the portion of IDJ's motion seeking judgment on the pleadings dismissing TVT's fraud claims is DENIED; and it is further

**ORDERED** that the portion of IDJ's motion seeking judgment on the pleadings dismissing TVT's claim for breach of the covenant of good faith and fair dealing is GRANTED.

**SO ORDERED.**

---

8. This letter is referenced in paragraphs 14, 31, and 36 of the Complaint.

9. Gottlieb testified that he would not have permitted IDJ to use TVT's "Get Tha Fortune" material had he not understood IDJ to have assented to the agreement embodied in the Side Letter. (Gurley Decl., Ex. A at 300–301, 313–14.)